Slip Op. 07-57

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                :
NATIVE FEDERATION OF THE        :
MADRE DE DIOS RIVER AND         :
TRIBUTARIES; RACIMOS DE         :
UNGURAHUI WORKING GROUP; and    :
NATURAL RESOURCES DEFENSE       :
COUNCIL, INC.,                  :
                                :
            Plaintiffs,         :
                                :
        v.                      : Before: Richard K. Eaton, Judge
                                :
BOZOVICH TIMBER PRODUCTS,       : Court No. 06-00181
INC.; TBM HARDWOODS, INC.;      :
T. BAIRD MCILVAIN               :
INTERNATIONAL CO.; UNITED       :
STATES DEPARTMENT OF THE        :
INTERIOR; UNITED STATES FISH    :
AND WILDLIFE SERVICE; UNITED    :
STATES DEPARTMENT OF AGRICUL-   :
TURE; ANIMAL AND PLANT HEALTH   :
INSPECTION SERVICE; UNITED      :
STATES DEPARTMENT OF HOMELAND   :
SECURITY; UNITED STATES CUSTOMS :
AND BORDER PROTECTION;          :
SECRETARY OF THE INTERIOR;      :
DIRECTOR OF THE UNITED STATES   :
FISH AND WILDLIFE SERVICE;      :
SECRETARY OF AGRICULTURE;       :
ADMINISTRATOR OF ANIMAL AND     :
PLANT HEALTH INSPECTION         :
SERVICE; SECRETARY OF HOMELAND  :
SECURITY; and COMMISSIONER OF   :
UNITED STATES CUSTOMS AND       :
BORDER PROTECTION,              :
                                :
            Defendants.         :
_____:
```

OPINION

[Plaintiffs' amended motion for preliminary injunction is denied;
Defendants' motions to dismiss are granted.]

Dated: April 16, 2007

*Simpson Thacher & Bartlett LLP* (*Robert A. Bourque*, *Kyle A. Lonergan* and *Scott D. Laton*); *Natural Resources Defense Council, Inc.* (*Mitchell S. Bernard* and *Thomas Cmar*); *Schonbrun DeSimone Seplow Harris & Hoffman LLP* (*Paul Hoffman*), of counsel, for plaintiffs Native Federation of the Madre de Dios River and Tributaries; Racimos de Ungurahui Working Group; and the Natural Resources Defense Council, Inc.

*Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (*Stephen C. Tosini*), for defendants U.S. Department of the Interior; U.S. Fish and Wildlife Service; U.S. Department of Agriculture; Animal and Plant Health Inspection Service; U.S. Department of Homeland Security; U.S. Customs and Border Protection; Secretary of the Interior; Director of the U.S. Fish and Wildlife Service; Secretary of Agriculture; Administrator of Animal and Plant Health Inspection Service; Secretary of Homeland Security; and Commissioner of the U.S. Customs and Border Protection.

*Hogan & Hartson LLP* (*Patrick D. Traylor* and *Jonathan T. Stoel*), for defendants Bozovich Timber Products, Inc.; TBM Hardwoods, Inc.; and T. Baird McIlvain International Company.

Eaton, Judge: Before the court are the amended motion for a preliminary injunction of plaintiffs Native Federation of the Madre de Dios River and Tributaries; Racimos de Ungurahui Working Group; and the Natural Resources Defense Council, Inc. ("plaintiffs") and the motions to dismiss of the U.S. Department of the Interior; the U.S. Fish and Wildlife Service ("FWS"); the U.S. Department of Agriculture; the Animal and Plant Health Inspection Service; the U.S. Department of Homeland Security; the U.S. Customs and Border Protection; the Secretary of the Interior; the Director of the FWS; the Secretary of Agriculture; the Administrator of the Animal and Plant Health Inspection

Service; the Secretary of Homeland Security; and the Commissioner of U.S. Customs and Border Protection ("Government Defendants"); and Bozovich Timber Products, Inc.; TBM Hardwoods, Inc.; and T. Baird McIlvain International Company ("Private Defendants") (collectively, "defendants").

By their complaint and motion for a preliminary injunction, plaintiffs allege that defendants have violated, and continue to violate, Section 9(c) of the Endangered Species Act, 16 U.S.C. §§ 1531-1544 (2000) ("ESA"), which implements the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("Convention" or "CITES").  CITES, Convention done at Washington, D.C., Aug. 3, 1973, T.I.A.S. No. 8249, 27 U.S.T. 1087. Specifically, plaintiffs complain that the Private Defendants trade in, and the Government Defendants authorize trade in, *Swietenia macrophylla*, a species of mahogany tree ("bigleaf mahogany") from Peru without valid export permits.  *See* Am. Compl. ¶ 3.

Plaintiffs seek declaratory relief and an injunction directing the Government Defendants to "refrain from permitting the importation into the United States of bigleaf mahogany from Peru;" and directing the Private Defendants to "refrain from the importation into the United States of . . . bigleaf mahogany . . . from Peru."  Pls.' Proposed Prelim. Inj. 1-2; *see also* Am. Compl. 29 (seeking, *inter alia*, to "[e]njoin[]

Government Defendants from permitting import, trade, and possession of Peruvian bigleaf mahogany unless and until bigleaf mahogany specimens from Peru comply with CITES").  In their respective motions to dismiss, defendants assert a number of defenses, among them that the court lacks subject matter jurisdiction to entertain plaintiffs' claims.

For the following reasons, the court finds that it does not have jurisdiction over plaintiffs' claims under 28 U.S.C. § 1581(i)(3) or (4) (2000).  The court therefore denies plaintiffs' motion for a preliminary injunction and grants defendants' motions to dismiss.

BACKGROUND

I.  Factual Summary

Plaintiffs bring this action on behalf of native communities and inhabitants of the Madre de Dios region of the Peruvian Amazon, where bigleaf mahogany is found.  Am. Compl. ¶¶ 8-16; *see also* 16 U.S.C. § 1540(g)(1) (providing for citizen suits). International demand for bigleaf mahogany timber is high, due to the dense, hard, high-value quality of the wood.[1]  Am. Compl.

---

[1]     According to plaintiffs' amended complaint, bigleaf mahogany trees "can grow more than 150 feet tall and six feet wide over the course of hundreds of years.  Its slow growth rate creates a dense, hard, high-value wood that has been coveted by traders for centuries.  At more than $1,500 per cubic meter of imported sawn wood, the timber from a single tree can yield more
                                                    (continued...)

¶ 1.  Plaintiffs allege that to meet demand, illegal logging of bigleaf mahogany trees takes place in Peru, which threatens the species with extinction and in turn results in injury to plaintiffs.  Am. Compl. ¶ 16.  It is further alleged that Peru's Scientific Authority, the National Agrarian University of La Molina ("La Molina"), and Peru's Management Authority, the National Institute of Natural Resources ("INRENA"), are aware of this illegal activity, and have nonetheless granted permits to export bigleaf mahogany without determining, as CITES requires, whether the wood to be exported was obtained in contravention of Peruvian law and whether the exports would be detrimental to the survival of bigleaf mahogany.  Am. Compl. ¶ 3.

Private Defendants are importers of Peruvian bigleaf mahogany into the United States.  There is no dispute that their shipments were accompanied by facially valid export permits. Even so, plaintiffs allege that the Private Defendants and the Government Defendants have violated the Convention and Section 9 of the ESA by, respectively, trading in and allowing trade in, bigleaf mahogany, because La Molina and INRENA have not made "legitimate non-detriment and lawful acquisition determinations" in connection with exports of bigleaf mahogany.  Am. Compl. ¶ 3.

---

[1](...continued)
than $100,000 when fashioned into luxury furniture."  Am. Compl. ¶ 41.

II.  Legal Framework

    A.  The Convention on International Trade in Endangered
        Species of Wild Fauna and Flora

The Convention is an international agreement to which the United States and Peru are parties.  It has as its purpose the "protection of certain species of wild fauna and flora against over-exploitation through international trade."  CITES Proclamation of the Contracting States, 27 U.S.T. at 1090 (recognizing that "international cooperation is essential" to achieving this goal).

The species covered by the Convention are listed in three appendices.  Species listed in Appendix I are those "threatened with extinction which are or may be affected by trade."  CITES, art. II ¶ 1, 27 U.S.T. at 1092.  Trade in Appendix I species "must be subject to particularly strict regulation in order not to endanger further their survival and must only be authorized in exceptional circumstances."  *Id.*, 27 U.S.T. at 1092.

Appendix II species include

> all species which although not necessarily
> now threatened with extinction may become so
> unless trade in specimens of such species is
> subject to strict regulation in order to
> avoid utilization incompatible with their
> survival . . . .

CITES, art. II ¶ 2(a), 27 U.S.T. at 1092.

Appendix III species include

> all species which any Party identifies as
> being subject to regulation within its

> jurisdiction for the purpose of preventing or
> restricting exploitation, and as needing the
> co-operation of other parties in the control
> of trade.

CITES, art. II ¶ 3, 27 U.S.T. at 1092.[2]

The Convention sets forth a detailed framework for
regulating trade through permitting processes that are carried
out by government agencies in the exporting and importing
countries.  The permit requirements for trade in Appendix I
species and Appendix II species are different.  Trade in Appendix
I species requires both an export permit, issued by the exporting
country, and an import permit, issued by the importing country.
*See* CITES, art. III ¶ 3, 27 U.S.T. 1093-94.  Trade in Appendix II
species, on the other hand, does not require that an import
permit be obtained, but only that the exporting country issue a
permit for the outgoing shipments.  *Compare* CITES, art. III, 27
U.S.T. 1093-94, *with* art. IV, 27 U.S.T. at 1095-96.[3]

---

[2]    Amendments to the lists of species in Appendices I and
II are considered and, where appropriate, adopted by the parties
to the Convention at meetings held biennially.  *See* CITES, arts.
XI, XV, 27 U.S.T. at 1104-05, 1110-12; *see also* http://www.cites.
org/eng/disc/CoP.shtml (last visited Apr. 16, 2007).  The CITES
Secretariat maintains the official list of species contained in
each appendix, which is available on the CITES Web site.  *See*
http://www.cites.org/eng/app/index.shtml (last visited Apr. 16,
2007).

[3]    U.S. regulations echo this distinction between
requirements for trade in Appendix I and Appendix II species.
*See* 50 C.F.R. § 23.12(a)(1)(i) (requiring both "a United States
import permit, issued pursuant to § 23.15, and a valid foreign
export permit issued by the country of origin" in order to import
                                            (continued...)

Bigleaf mahogany from Peru is a species of plant listed in Appendix II.  By the Convention's terms, "[a]ll trade in specimens of species included in Appendix II shall be in accordance with the provisions of [Article IV of the Convention]."  CITES, art. IV ¶ 1, 27 U.S.T. at 1095.  In pertinent part, Article IV[4] provides:

---

[3](...continued)
Appendix I species) & § 23.12(a)(2)(i) (2005) (requiring only "a valid foreign export permit issued by the country of origin" in order to import Appendix II species).

[4]      As previously noted, trade in Appendix I species requires both an export permit, issued by the exporting country, and an import permit, issued by the importing country.  Thus, Article III of the Convention contains the same language found in Article IV subparagraphs (a), (b) and (c), with respect to the conditions that must be met before an export permit shall be granted, but also states an additional condition, namely "(d) a Management Authority of the State of export is satisfied that an import permit has been granted for the [Appendix I] specimen."  CITES, art. III ¶ 2(d), 27 U.S.T. at 1093.  With respect to the required import permit, it states:

> An import permit shall only be granted when the following conditions have been met:
>
> > (a) a Scientific Authority of the State of import has advised that the import will be for purposes which are not detrimental to the survival of the species involved;
> >
> > (b) a Scientific Authority of the State of import is satisfied that the proposed recipient of a living specimen is suitably equipped to house and care for it; and
> >
> > (c) a Management Authority of the State of import is satisfied that

(continued...)

The export of any specimen of a species included in Appendix II shall require the prior grant and presentation of an export permit.  An export permit shall only be granted when the following conditions have been met:

(a) a Scientific Authority of the State of export has advised that such export will not be detrimental to the survival of that species; [and]

(b) a Management Authority of the State of export is satisfied that the specimen was not obtained in contravention of the laws of that State for the protection of fauna and flora . . . .

The import of any specimen of a species included in Appendix II shall require the prior presentation of . . . an export permit . . . .

CITES, art. IV ¶¶ 2, 4, 27 U.S.T. at 1095-96.  Thus, in order for Peru to export bigleaf mahogany its Scientific Authority (La Molina) and Management Authority (INRENA) must be satisfied that certain enumerated preconditions have been met.  The only express obligation that Article IV places on a country importing bigleaf mahogany is to "require the prior presentation of" an export permit.  CITES, art. IV ¶ 4, 27 U.S.T. at 1096.

---

[4](...continued)
the specimen is not to be used for primarily commercial purposes.

CITES, art. III ¶ 3(a)-(c), 27 U.S.T. at 1093-94.

     B.   The Endangered Species Act

     Congress enacted the ESA to conserve endangered and

threatened species[5] and the ecosystems on which they depend, and

"to take such steps as may be appropriate to achieve the purposes

of," *inter alia*, CITES.   16 U.S.C. § 1531(b).   Section 9(c) of

the ESA implements the Convention into U.S. law:

> It is unlawful for any person subject to the
> jurisdiction of the United States to engage
> in any trade[6] in any specimens contrary to
> the provisions of the Convention, or to
> possess any specimens traded contrary to the
> provisions of the Convention, including the
> definitions of terms in article I thereof.

16 U.S.C. § 1538(c)(1).   Plaintiffs assert their claims under

Section 9(c).


III. Plaintiffs' Claims

     In their complaint, plaintiffs allege that La Molina and

INRENA have acknowledged having insufficient information to make

the non-detriment and lawful acquisition findings required for

---

     [5]    An "endangered species" is one "in danger of extinction
throughout all or a significant portion of its range . . . ."   16
U.S.C. § 1532(6).   A "threatened species" is one that is "likely
to become an endangered species within the foreseeable future
throughout all or a significant portion of its range."   *Id.*
§ 1532(20).

     [6]    Under Article I of the Convention, "'[t]rade' means
export, re-export, import and introduction from the sea."   CITES,
art. I(c), 27 U.S.T. at 1090.   The ESA does not define "trade."

export under Article IV of the Convention.[7]  *See* Am. Compl.

¶¶ 58-72, 90-104.  Plaintiffs further allege that by honoring the

facially valid export permits, the Government Defendants have

violated U.S. law.  Am. Compl. ¶¶ 3, 90-109.  Thus, plaintiffs

have brought suit to enjoin defendants from importing bigleaf

mahogany into the United States "unless and until bigleaf

mahogany specimens from Peru comply with CITES."  Am. Compl. 29.


STANDARD OF REVIEW

By their motion for a preliminary injunction, plaintiffs ask

the court "to enjoin the importation of Peruvian bigleaf mahogany

pending the outcome of this lawsuit."  Mem. Supp. Pls.' Am. Mot.

Prelim. Inj. 44.  Plaintiffs bear the burden of establishing a

right to the relief they seek in light of four factors: (1) the

likelihood that plaintiffs will succeed on the merits of their

claims; (2) that plaintiffs will suffer irreparable harm without

the requested injunctive relief; (3) that the balance of

hardships tips in plaintiffs' favor; and (4) that granting the

requested relief would not be contrary to the public interest.

---

[7]     *See, e.g.*, Appendix to Pls.' Am. Mot. Prelim. Inj.,
Exs. M (Letter from Ignacio Lombardi Indacochea (La Molina) to
Rosario Acero Villanes (INRENA) of Nov. 12, 2004); N (Letter from
Peter O. Thomas (FWS) to Leoncio Alvarez Vasquez (INRENA) of Dec.
14, 2004); Q (La Molina, Summary of Activities Performed by CITES
Scientific Authority in Regard to *Swietenia macrophylla* Species
(Feb. 11, 2005)); and R (Letter from Leoncio Alvarez Vasquez
(INRENA) to Peter O. Thomas (FWS) of Feb. 9, 2005).

*See FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993) (citing *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983)).

In considering plaintiffs' motion for a preliminary injunction and defendants' motions to dismiss, the court accepts as true the well-pled factual allegations made in plaintiffs' first amended complaint and construes "all reasonable inferences in favor of [plaintiffs]." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991); *see also Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

As to defendants' motions to dismiss for lack of subject matter jurisdiction, plaintiffs bear the burden of establishing the Court's jurisdiction. *See United States v. Biehl & Co.*, 3 CIT 158, 160, 539 F. Supp. 1218, 1220 (1982) (citing, *inter alia*, *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 188-89 (1936)).


DISCUSSION

The Court of Appeals for the Federal Circuit has said that, when ruling on a motion for a preliminary injunction, this Court must consider whether it has subject matter jurisdiction to hear the plaintiff's claims. *See U.S. Ass'n of Imps. of Textiles and Apparel v. United States*, 413 F.3d 1344, 1348 (Fed. Cir. 2005) ("The question of jurisdiction closely affects the [plaintiff's]

likelihood of success on its motion for a preliminary injunction.

Failing to consider it [is] legal error.").  Where subject matter

jurisdiction is lacking, denial of a motion for a preliminary

injunction is required.  *Id*. at 1350 (reversing grant of

preliminary injunction on ground that plaintiff could not show

even a "fair chance" of success on the merits because plaintiff's

claims were not ripe).

     In their complaint, plaintiffs assert that the Court has

subject matter jurisdiction under 28 U.S.C. § 1581(i)(3) and (4).

Am. Compl. ¶ 5.  Section 1581(i)(3) provides:

> In addition to the jurisdiction conferred
> upon the Court of International Trade by
> subsections (a)-(h) of this section . . .,
> the Court of International Trade shall have
> exclusive jurisdiction of any civil action
> commenced against the United States, its
> agencies, or its officers, that arises out of
> any law of the United States providing
> for . . .
>
> (3) embargoes or other quantitative
> restrictions on the importation of
> merchandise for reasons other than the
> protection of the public health or
> safety . . . .

28 U.S.C. § 1581(i)(3).  Plaintiffs argue that Section

1581(i)(3)'s requirement that the claims they assert "arise[] out

of any law of the United States providing for . . . [an]

embargo[]" is satisfied by Section 9(c) of the ESA.  *See* Pls.'

Mem. Opp'n Defs.' Mots. Dismiss 8 ("Plaintiffs' claims arise

under ESA § 9(c), which makes it 'unlawful . . . to engage in *any*

Court No. 06-00181                                              Page 14

trade in any specimens contrary to the provisions of the

Convention.'  Accordingly, because it prohibits all imports in

contravention of CITES, ESA § 9(c) provides for an embargo.")

(quoting 16 U.S.C. § 1538(c)(1); emphasis in original).

Therefore, plaintiffs argue that their claims fall within the

Court's exclusive jurisdiction.

        By their motions to dismiss, defendants dispute plaintiffs'

jurisdictional claim.  In doing so, they distinguish Section 9(a)

of the ESA[8] from Section 9(c) and argue that Section 9(c) does

not provide for an embargo on trade in species listed in Appendix

II of CITES.  According to defendants, by adopting Section 9(a),

Congress expressly banned imports of certain named species that

the Secretary of Commerce or the Secretary of the Interior has

determined are "endangered."  *See* 16 U.S.C. § 1533(a).  Here,

however, because the imported species has not been found by the

Secretary to be endangered, but is rather listed in Appendix II

of the Convention, defendants insist that there is no embargo

_____

        [8]    Section 9(a) is codified at 16 U.S.C. § 1538(a), which
provides in pertinent part:

                Except as provided in sections 1535(g)(2) and
                1539 of this title, with respect to any
                endangered species of plants listed pursuant
                to section 1533 of this title, it is unlawful
                for any person subject to the jurisdiction of
                the United States to—[*inter alia*,] (A) import
                any such species into, or export any such
                species from, the United States . . . .

16 U.S.C. § 1538(a)(2).

under the ESA.  *See* Gov't Defs.' Mot. Dismiss Pls.' First Am.
Compl. ("Gov't Defs.' Mot.") 9-10.  Rather, defendants insist
that "ESA Section 9(c), the provision that addresses the
regulation of CITES listed species, simply requires parties to
follow CITES procedures . . . ."  Gov't Defs.' Mot. 9.

Thus, the question for the court is whether CITES and the
ESA provide for an embargo on the importation of bigleaf mahogany
or for the regulation of trade in the species.  For the reasons
that follow, the court concludes that Section 9(c) of the ESA
does not provide for an embargo on the importation of Appendix II
species into the United States and that therefore Section
1581(i)(3) does not provide a basis for hearing plaintiffs'
claims.

To determine what constitutes an embargo, a review of *K Mart
Corp. v. Cartier, Inc.*, 485 U.S. 173 (1988), is necessary.  *In K
Mart*, the United States Supreme Court was presented with the
question of whether Section 526(a) of the Tariff Act of 1930, 19
U.S.C. § 1526(a),[9] imposed an embargo within the meaning of 28

---

[9]    The version of Section 1526(a) in force at the time
provided:

(a) *Importation prohibited*

Except as provided in subsection (d) of this
section, it shall be unlawful to import into
the United States any merchandise of foreign
manufacture if such merchandise, or the
label, sign, print, package, wrapper, or
                                    (continued...)

U.S.C. § 1581(i)(3).  The Court found that the word embargo, as

it appears in Section 1581(i)(3), is to be given its ordinary

meaning, i.e., "a governmentally imposed quantitative restriction

- of zero - on the importation of merchandise."  *Id.* at 185.[10]

In the course of its analysis, the Court made clear that "not

every governmental importation prohibition is an embargo":

> To hold otherwise would yield applications of
> the term "embargo" that are unnatural, to say
> the least.  For example, the prohibitory
> nature of regulations providing that the
> "*importation* into the United States of milk
> and cream is *prohibited*"[11] except by a
> permitholder, and that "Customs officers
> *shall not permit the importation* of any milk
> or cream that is not tagged in accordance
> with [applicable] regulations," would convert
> licensing and tagging requirements into

---

[9](...continued)
    receptacle, bears a trademark owned by a
    citizen of, or by a corporation or
    association created or organized within, the
    United States, and registered in the Patent
    and Trademark Office by a person domiciled in
    the United States . . . unless written
    consent of the owner of such trademark is
    produced at the time of making entry.

19 U.S.C. § 1526(a) (emphasis added) (quoted in *K Mart Corp.*, 485
U.S. at 179 n.1).

[10]   Ultimately, the Court held that § 1526(a) did not
impose an embargo because it "does not set a *governmentally
determined* quantitative limit on the entry of, or foreign
trafficking in, any particular product . . . ."  *K Mart Corp.*,
485 U.S. at 186 (emphasis added).

[11]   It is worth noting that the *K Mart* Court recognized
that the presence of the word "prohibited" in a statute does not
necessarily mean it constitutes an embargo.  *K Mart Corp.*, 485
U.S. at 187.

> embargoes on unlicensed or improperly tagged
> dairy products.  Similarly, a requirement
> that certain meat products be inspected prior
> to importation would magically become an
> embargo of uninspected (but not necessarily
> tainted) meat when Congress uses a
> formulation like, "meat . . . products *shall*
> *not be released from Customs* custody prior to
> inspection[.]"

*Id*. at 187 (citing 19 C.F.R. §§ 12.7(a) & (b), 12.8 (1987))

(emphasis, first alteration and ellipsis in original).  Thus, by

choosing the word "embargoes" over the phrase "importation

prohibitions" in Section 1581(i)(3), Congress created a

circumscribed sub-class of importation prohibitions that falls

within the Court's jurisdiction.  *Id*. at 189; *see also Earth*

*Island Inst. v. Brown*, 28 F.3d 76, 77 (9th Cir. 1994) ("[T]he [*K*

*Mart*] Court made it clear that the term 'embargo' does not, for

purposes of § 1581(i), encompass all importation prohibitions,

but rather names a subclass of importation prohibitions.").  In

so choosing, Congress declined to grant this Court jurisdiction

to review challenges to "conditions of importation" as distinct

from those involving embargoes.  *K Mart Corp*., 485 U.S. at 189.

     The court finds that Section 9(c) does not forbid trade in

species protected under the Convention.  Rather, it mandates

compliance with the Convention, which "regulates international

trade in wild species . . . through the requirement that certain

forms of documents must accompany shipments of protected

species."  *Cayman Turtle Farm, Ltd. v. Andrus*, 478 F. Supp. 125,

130 (D.D.C. 1979).  "The degree of trade *regulation* under CITES

depends on the appendix in which a specimen is listed." *United*

*States v. Norris*, 452 F.3d 1275, 1278 (11th Cir. 2006) (emphasis

added).

　　　That it does not forbid trade in species listed in the

appendices is evident from the language of CITES itself.  The

Convention expressly states that the agreement does not infringe

on the ability of the parties to adopt stricter measures than are

provided in the Convention, including "complete prohibition" of

trade in CITES-listed species, or any other species.  *See* CITES,

art. XIV ¶ 1(a), 27 U.S.T. at 1108 (providing that parties may

adopt "stricter domestic measures regarding the conditions for

trade, taking possession or transport of specimens of species

included in Appendices I, II and III, or the complete prohibition

thereof") and (b) (providing same with respect to non-CITES-

listed species).  If the Convention were intended to ban trade,

this language would not be necessary.

　　　Next, in implementing the Convention, the United States

elected to track the Convention's permit requirements in the

regulations promulgated by the FWS and to take "stricter

measures" only insofar as requiring that an export permit must be

"valid." *Compare* CITES, art. IV ¶ 4, 27 U.S.T. at 1096

(requiring "an export permit") *with* 50 C.F.R. § 23.12(a)(2)(i)

(requiring "a valid foreign export permit issued by the country

of origin").  The regulations provide in pertinent part:

> (a) *Unless the requirements in this part 23
> are met*, . . . it is unlawful for any person
> subject to the jurisdiction of the United
> States to commit, attempt to commit, solicit
> another to commit, or cause to be committed
> any of the acts described in paragraph[]
> (b) . . . of this section.
>
> (b) Import. (1) It is unlawful to import into
> the United States any . . . plant listed in
> appendix I, II or III . . . from any foreign
> country.

50 C.F.R. § 23.11(a) & (b) (emphasis added).  The "requirements

in this part 23" referenced in § 23.11(a) above are contained in

§ 23.12(a)(2)(i), which provides:

> In order to import into the United States any
> wildlife or plant listed in appendix II from
> any foreign country, a valid foreign export
> permit issued by the country of origin . . .
> must be obtained prior to such importation.

50 C.F.R. § 23.12(a)(2)(i).  The regulations further provide that

"[o]nly export permits . . . issued and signed by a management

authority will be accepted as a valid foreign document from a

country that is a party to the Convention."[12]  50 C.F.R.

---

[12]    The regulations do not specify any criteria to
determine whether a foreign export permit is "valid."  *See
Castlewood Prods., LLC v. Norton*, 365 F.3d 1076, 1083 (D.C. Cir.
2004) (noting 50 C.F.R. § 23.12(a)(3)(i) "does not specify the
conditions that a foreign export permit must meet in order for
U.S. officials to regard the permit as valid, i.e., to conclude
that the exporting Management Authority was 'satisfied that the
specimen was not obtained in contravention of the laws of that
State'").  In the past, when a Customs inspector or other U.S.
official has found reason to believe the export permit may not be
valid, U.S. officials have "looked behind" the permit to ensure
(continued...)

§ 23.14(a).  A Customs inspector must validate documentation

accompanying Appendix II species at the time of import by

endorsing the documentation.  *See* 7 C.F.R. § 355.22(a) & (c).

"Validation" is defined as "[a]n original stamp, signature, and

date of inspection placed upon documentation required by 50

CFR . . . part 23 [pertaining to CITES-listed species] by an

inspector at the port where the terrestrial plants are to be

imported . . . ."  *Id.* § 355.2.  Thus, like the Convention

itself, the regulations do not completely ban trade in Appendix

II species but rather regulate it.

It is clear that Congress anticipated that lines would be

drawn between laws that provide for the regulation of trade and

those that provide for embargoes in order to avoid the

"unnatural" results the Supreme Court cautioned against in *K*

---

[12](...continued)
the export permit was issued in compliance with CITES.  *See,
e.g.,* *id.* at 1084 (where Brazilian authorities notified the
United States that issuance of export permits with respect to
bigleaf mahogany shipments was not the result of an independent
judgment made by the Management Authority in Brazil, the court
upheld the seizure of such shipments as reasonable); *United
States v. 2,507 Live Canary Winged Parakeets*, 689 F. Supp. 1106,
1120 (S.D. Fla. 1988) (probable cause to institute forfeiture
action was found to exist where Peruvian authorities informed the
United States that export permits accompanying shipments of
parakeets were invalid and requested that the United States take
appropriate action); *United States v. 3,210 Crusted Sides of
Caiman Crocodilus Yacare*, 636 F. Supp. 1281, 1285 (S.D. Fla.
1986) (probable cause for instituting forfeiture action was found
to exist where export permits were deemed suspicious in that
shipments contained thousands more crocodile hides than reported
on the permit and the permit was a copy, not an original).

*Mart.  See K Mart Corp.*, 485 U.S. at 187.  An examination of the
conditions of importation cited in *K Mart* as insufficient to
constitute embargoes reveals that the permit requirements in the
Convention and the U.S. regulations do not amount to a ban on
trade.  For instance, health-related restrictions on importation,
such as the "prohibition" against the importation of milk and
cream "unless the person by whom such milk or cream is shipped or
transported into the United States holds a valid permit," 19
C.F.R. § 12.7(a) (1987); or the restriction on release of meat
products without prior inspection, 19 C.F.R. § 12.8 ("Such meat,
meat-food products, horse meat and horse meat-food products shall
not be released from Customs custody prior to inspection by an
inspector . . ., except when authority is given by such inspector
for inspection at the importer's premises or other place not
under Customs supervision.") are not embargoes.  *See K Mart
Corp.*, 485 U.S. at 187.  Similarly, the regulation concerning the
importation of Appendix II species anticipates trade in those
species, on the condition that "the requirements in . . . [50
C.F.R. § 23.12(a)(2)(i)] are met," i.e., the presentation of a
valid foreign export permit.  50 C.F.R. § 23.11(a).

Finally, CITES, Section 9(c) of the ESA and the implementing
regulations are qualitatively different from laws that this Court
has found to provide for embargoes.  Absent from those laws is a
simple permitting scheme like the one present here.  Rather, the

laws found to provide for embargoes prohibit trade outright

albeit with limited exceptions.  *See, e.g.*, *Int'l Labor Rights*

*Fund v. United States*, 29 CIT __, __, 391 F. Supp. 2d 1370, 1371

(2005) (Section 307 of the Tariff Act of 1930, codified as

amended at 19 U.S.C. § 1307 (2002),[13] prohibited importation of

merchandise produced by forced labor, except where domestic

consumption is greater than domestic production); *Florsheim Shoe*

*Co. v. United States*, 19 CIT 295, 297, 880 F. Supp. 848, 850

(1995) (Presidential proclamation issued under Pelly Amendment to

Fishermen's Protective Act of 1967, codified as amended at 22

---

[13]    Title 19 U.S.C. § 1307 provides:

> All goods, wares, articles, and merchandise
> mined, produced or manufactured wholly or in
> part in any foreign country by convict labor
> or/and forced labor or/and indentured labor
> under penal sanctions shall not be entitled
> to entry at any of the ports of the United
> States, and the importation thereof is hereby
> prohibited, . . . ; but in no case shall such
> provisions be applicable to goods, wares,
> articles, or merchandise so mined, produced,
> or manufactured which are not mined,
> produced, or manufactured in such quantities
> in the United States as to meet the
> consumptive demands of the United States.
>
> "Forced labor", as herein used, shall mean
> all work or service which is exacted from any
> person under the menace of any penalty for
> its nonperformance and for which the worker
> does not offer himself voluntarily.  For
> purposes of this section, the term "forced
> labor or/and indentured labor" includes
> forced or indentured child labor.

19 U.S.C. § 1307.

U.S.C. § 1978 (Supp. V 1993),[14] prohibited "the importation of

fish or wildlife . . . and their parts and products, of

Taiwan . . . ."); *Humane Soc'y of the United States v. Brown*, 19

CIT 1104, 901 F. Supp. 338 (1995) (High Seas Driftnet Fisheries

Enforcement Act, 16 U.S.C. § 1826a (Supp. V 1993) ("Driftnet

Act")[15] prohibited the importation of "fish and fish products and

---

[14]    Section 1978 provided, in pertinent part:

Upon receipt of any certification made
[Secretary of Commerce or the Secretary of
the Interior] under paragraph [(a)](1) or
(2), the President may direct the Secretary
of the Treasury to prohibit the bringing or
the importation into the United States of any
products from the offending country for any
duration as the President determines
appropriate and to the extent that such
prohibition is sanctioned by the General
Agreement on Tariff and Trade.

22 U.S.C. § 1978(a)(4).

[15]    In pertinent part, the Driftnet Act provided:

(b) Sanctions

(1) Identifications

(A) Initial identifications

Not later than January 10, 1993,
the Secretary of Commerce shall-

(i) identify each nation whose
nationals or vessels are conducting
large-scale driftnet fishing beyond
the exclusive economic zone of any
nation; and

(ii) notify the President and that
                                    (continued...)

sport fishing equipment . . . from [a] nation" identified by the

Secretary of Commerce to be "conducting large-scale driftnet

fishing beyond the exclusive economic zone of any

nation . . . ."); *Earth Island Inst. v. Christopher*, 19 CIT 812,

813-14, 890 F. Supp. 1085, 1087-88 (1995) (Note to 16 U.S.C.

§ 1537[16] prohibited "[t]he importation of shrimp or products from

---

[15](...continued)
            nation of the identification under
            clause (i). . .

      (3) Prohibition on imports of fish and fish
      products and sport fishing equipment

            (A) Prohibition

            The President-

            (i) upon receipt of notification of
            the identification of a nation
            under paragraph (1)(A) . . .

            shall direct the Secretary of the
            Treasury to prohibit the
            importation into the United States
            of fish and fish products and sport
            fishing equipment . . . from that
            nation.

16 U.S.C. § 1826a(b).  The stated congressional policy underlying
the Driftnet Act was to implement a United Nations General
Assembly resolution, which called for, among other things, "an
*immediate cessation* to further expansion of large-scale driftnet
fishing," "a *moratorium* on fishing in the Central Bering Sea" and
"a *permanent ban* on the use of destructive fishing practices, and
in particular large-scale driftnets, by persons or vessels
fishing beyond the exclusive economic zone of any nation."  16
U.S.C. § 1826a (emphasis added).

      [16]    The note to Section 1537 of the ESA provided, in
pertinent part:

                                                       (continued...)

shrimp which have been harvested with commercial fishing

technology which may affect adversely [certain] species of sea

turtles," except where a finding is made under 16 U.S.C.

---

[16](...continued)
       (b)(1) In General.-The importation of shrimp
       or products from shrimp which have been
       harvested with commercial fishing technology
       which may affect adversely such species of
       sea turtles shall be prohibited not later
       than May 1, 1991, except as provided in
       paragraph (2).

       (2) Certification Procedure.-The ban on
       importation of shrimp or products from shrimp
       pursuant to paragraph (1) shall not apply if
       the President shall determine and certify to
       the Congress not later than May 1, 1991, and
       annually thereafter that-

              (A) the government of the
              harvesting nation has provided
              documentary evidence of the
              adoption of a regulatory program
              governing the incidental taking of
              such sea turtles in the course of
              such harvesting that is comparable
              to that of the United States; and

              (B) the average rate of that
              incidental taking by the vessels of
              the harvesting nation is comparable
              to the average rate of incidental
              taking of sea turtles by United
              States vessels in the course of
              such harvesting; or

              (C) the particular fishing
              environment of the harvesting
              nation does not pose a threat of
              the incidental taking of such sea
              turtles in the course of such
              harvesting.

16 U.S.C. § 1537 note.

§ 1537(b)(2)).  In contrast to the stringent statutory
requirements that must be satisfied before merchandise subject to
an embargo may enter the country, e.g., the certification
procedure in 16 U.S.C. § 1537(b)(2),[17] an importer of an Appendix
II species, such as bigleaf mahogany from Peru, may enter the
merchandise upon presenting a valid export permit obtained from
the Peruvian authorities.  *See supra* Part II A at 9.

By entering into the Convention, the United States did not
agree to end trade in CITES-listed species, nor did it elect to
do so by enacting Section 9(c) to implement the Convention.  On
the contrary, the aim of CITES and the provisions of the ESA that
implement it is to permit trade in certain species in a
controlled, sustainable manner.  *See* CITES Proclamation of the
Contracting States, 27 U.S.T. at 1090 (recognizing that

---

[17]     Notably absent from Section 9(c), the regulations and
Article IV of CITES is any requirement that the U.S. Government
make a finding with respect to foreign countries based on an
investigation of those countries' activities.  *Compare, e.g.*,
*Florsheim Shoe Co.*, 19 CIT at 297, 880 F. Supp. at 849 (noting
that the Secretary of the Interior "certified Taiwan under 22
U.S.C. § 1978 . . . as a country whose activities were
diminishing the effectiveness of international conservation
measures"); *Earth Island Inst.*, 19 CIT at 814, 890 F. Supp. at
1088 (quoting 16 U.S.C. § 1537(b)(2), which provides for
certification to Congress that a "harvesting nation" has a
regulatory program governing the incidental taking of sea turtles
that is comparable to that of the United States); *Humane Soc'y of
the United States*, 19 CIT at 1109, 901 F. Supp. at 344 (quoting
16 U.S.C. § 1826a(b)(1)(A), which provides that the Secretary of
Commerce "shall identify each nation . . . conducting large-scale
driftnet fishing beyond the exclusive economic zone of any
nation . . . .").

"international cooperation is essential for the protection of
certain species of wild fauna and flora against *over-exploitation*
through international trade") (emphasis added); 16 U.S.C.
§ 1531(a)(4)(F) (stating that "the United States has pledged
itself as a sovereign state in the international community to
conserve *to the extent practicable* the various species of fish or
wildlife and plants facing extinction, pursuant to . . . [the
Convention]") (emphasis added).

In sum, CITES provides for the regulation of trade in
bigleaf mahogany.  The regulations that implement Section 9(c),
and in turn, the Convention, while restricting trade, do not
restrict the quantity of imports to zero.  *K Mart Corp.*, 485 U.S.
at 185.  Thus, plaintiffs' Section 9(c) claims do not arise under
a U.S. law that provides for an embargo under 28 U.S.C.
§ 1581(i)(3).

Since plaintiffs have failed to establish jurisdiction under
Section 1581(i)(3), Section 1581(i)(4) cannot provide a
jurisdictional basis.  The latter provision applies where the law
pursuant to which a claim is brought provides for the
"administration and enforcement with respect to the matters
referred to in [*inter alia*] paragraph[] . . . (3) of this
subsection . . . ."  28 U.S.C. § 1581(i)(4).  Since Section 9(c)
does not provide for an embargo, Section 1581(i)(4) does not
provide an independent basis for jurisdiction.  *See Retamal v.*

Court No. 06-00181                                    Page 28

*United States Customs & Border Prot.*, 439 F.3d 1372, 1375 (Fed.
Cir. 2006) ("[The plaintiff's] claims do not relate to the
'administration and enforcement' of a matter referred to in
subsections 1581(a)-(h) or in 1581(i)(1)-(3).  Therefore, section
1581(i)(4) does not provide an independent ground for
jurisdiction in this case.").


                              CONCLUSION

     For the forgoing reasons, the court does not have subject
matter jurisdiction over plaintiffs' claims.  Therefore,
plaintiffs have not met their burden of showing a likelihood that
they will succeed on the merits, and their motion for a
preliminary injunction must be denied.  *See U.S. Ass'n of Imps.*,
413 F.3d at 1350.  Further, because the Court lacks subject
matter jurisdiction in this case, defendants' motions to dismiss
are granted.  Judgment shall enter accordingly.




                                   /s/ Judge Richard K. Eaton
                                     Richard K. Eaton


Dated:      April 16, 2007
            New York, New York

Slip Op. 07-57

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____ :
                                 :
NATIVE FEDERATION OF THE         :
MADRE DE DIOS RIVER AND          :
TRIBUTARIES; RACIMOS DE          :
UNGURAHUI WORKING GROUP; and     :
NATURAL RESOURCES DEFENSE        :
COUNCIL, INC.,                   :
                                 :
              Plaintiffs,        :
                                 :
         v.                      : Before: Richard K. Eaton, Judge
                                 :
BOZOVICH TIMBER PRODUCTS,        : Court No. 06-00181
INC.; TBM HARDWOODS, INC.;       :
T. BAIRD MCILVAIN                :
INTERNATIONAL CO.; UNITED        :
STATES DEPARTMENT OF THE         :
INTERIOR; UNITED STATES FISH     :
AND WILDLIFE SERVICE; UNITED     :
STATES DEPARTMENT OF AGRICUL-    :
TURE; ANIMAL AND PLANT HEALTH    :
INSPECTION SERVICE; UNITED       :
STATES DEPARTMENT OF HOMELAND    :
SECURITY; UNITED STATES CUSTOMS  :
AND BORDER PROTECTION;           :
SECRETARY OF THE INTERIOR;       :
DIRECTOR OF THE UNITED STATES    :
FISH AND WILDLIFE SERVICE;       :
SECRETARY OF AGRICULTURE;        :
ADMINISTRATOR OF ANIMAL AND      :
PLANT HEALTH INSPECTION          :
SERVICE; SECRETARY OF HOMELAND   :
SECURITY; and COMMISSIONER OF    :
UNITED STATES CUSTOMS AND        :
BORDER PROTECTION,               :
                                 :
              Defendants.        :
_____ :
```

<u>JUDGMENT</u>

This case having been submitted for decision; and the court, after due deliberation, having issued the decision herein; Now therefore, in conformity with said decision, it is hereby

Court No. 06-00181                                    Page 2

    ORDERED that plaintiffs' motion for a preliminary injunction

is denied; and it is further

    ORDERED that defendants' motions to dismiss are granted.




                                        /s/ Judge Richard K. Eaton
                                           Richard K. Eaton


Dated:     April 16, 2007
           New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                                      Deputy Clerk